Andrew M. Calamari
Sanjay Wadhwa
Michael D. Paley
Paul G. Gizzi
Judith Weinstock
Kristine M. Zaleskas
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-9078 (Weinstock)
Email: WeinstockJ@SEC.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| | : |
| Plaintiff, | : |
| *v.* | : 15 Civ. _____ (___) |
| | : |
| JOSHUA SAMUEL AARON, GERY SHALON, | : COMPLAINT |
| and ZVI ORENSTEIN, | : |
| | : |
| Defendants. | : |
| | : (ECF CASE) |

---

Plaintiff Securities and Exchange Commission (the "Commission"), for its

complaint against defendants Joshua Samuel Aaron ("Aaron"), Gery Shalon ("Shalon"),

and Zvi Orenstein ("Orenstein") (collectively, the "Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      This action concerns the Defendants' roles in multiple "pump-and-dump"

schemes dating back to at least mid-2011. Through their control of numerous

promotional websites and possession of vast email lists, defendants Aaron and Shalon

touted penny stocks in order to unlawfully profit from the short-term increase in the price

and trading volume of each stock caused by their promotional campaign.  These promotional campaigns frequently urged people to buy shares of the promoted issuers without properly disclosing that the promoters themselves owned shares of these issuers and, contrary to their exhortations to readers of their emails to buy shares, intended to sell those shares immediately.

2.      During 2011 through 2012, defendants Aaron and Shalon unlawfully promoted, and, with defendant Orenstein, unlawfully schemed to defraud investors in, the stocks of at least the following six microcap issuers: Southern Home Medical Equipment, Inc.; Greenfield Farms Grassfed Beef, Inc.; Next Generation Energy Corporation; Mustang Alliances, Inc.; IDO Security, Inc.; and Premier Brands, Inc.

3.      By engaging in the conduct set forth in this Complaint, (a) defendants Aaron and Shalon violated – and unless permanently enjoined, will continue to violate – Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; (b) defendant Orenstein violated – and unless permanently enjoined, will continue to violate – Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)]; and (c) each defendant aided and abetted the other defendants' violations.

### NATURE OF THE PROCEEDINGS AND THE RELIEF SOUGHT

4.      The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)].

5.      The Commission seeks a final judgment: (a) permanently enjoining Defendants from committing future violations of the above provisions of the federal securities laws; (b) ordering Defendants to disgorge any ill-gotten gains with prejudgment interest thereon; (c) ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (d) prohibiting Defendants, pursuant to Section 21(d)(6)(A) of the Exchange Act [15 U.S.C. § 78u(d)(6)(A)] from participating in an offering of penny stock; and (e) ordering such other and further relief the Court may deem just and proper.

### JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to Sections 20(d)(1) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d)(1) and 77v(a)] and Section 21(d) and 27 of the Exchange Act, [15 U.S.C. §§ 78u(d) and 78aa].  Venue lies in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and  Section 27 of the Exchange Act [15 U.S.C. § 78aa].  A substantial portion of the transactions, acts, practices and courses of business constituting the violations alleged herein occurred within the Southern District of New York.

7.      In connection with the transactions, acts, practices and courses of business alleged in this Complaint, Defendants, directly or indirectly, singly or in concert, have

3

made use of the means and instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange.

## DEFENDANTS

8.      **Aaron**, aka Mike Shields, age 31, is an American citizen, and currently resides in Israel.

9.      **Shalon**, aka Phillipe Mousset and Christopher Engeham, age 31, is a native of the Republic of Georgia and an Israeli citizen, and currently resides in Israel.

10.     **Orenstein**, aka Aviv Stein and John Avery, age 41, is an Israeli citizen, and currently resides in Israel.

## RELEVANT PARTIES

### The Issuers

11.     **Southern Home Medical Equipment, Inc. ("SHOM")** is a microcap issuer incorporated in Nevada and headquartered in Greer, South Carolina.  It is quoted on OTC Link, operated by OTC Markets Group ("OTC Link"), under the ticker SHOM.

12.     **Greenfield Farms Grassfed Beef, Inc. ("GRAS")**  is a microcap issuer incorporated in Nevada, and based in West Palm Beach, Florida.  It is quoted on OTC Link under the ticker GRAS.

13.     **Next Generation Energy Corporation ("NGMC")** is a microcap issuer incorporated in Nevada, and based in Annandale, Virginia.  It is quoted on OTC Link under the ticker NGMC.

14.     **Mustang Alliances, Inc. ("MSTG")** is a microcap issuer incorporated in Nevada, and based in Miami, Florida.  It is quoted on OTC Link under the ticker MSTG.

15.    **IDO Security, Inc. ("IDOI")** is a microcap issuer incorporated in Nevada, and based in Miami, Florida.  IDOI was formed from a reverse merger of IDO Security Ltd. and a publicly traded shell company in 2004.  It is quoted on OTC Link under the ticker IDOI.

16.    **Premier Brands, Inc. ("BRND")** is a microcap issuer incorporated in Wyoming, and headquartered in Bonita, California.  It is quoted on OTC Link under the ticker BRND.

## FACTS

### Overview of the Defendants' Schemes

17.    In 2011 and 2012, the Defendants controlled at least twenty stock promotion websites as well as various email address lists.  In a typical promotional campaign, the Defendants sent multiple emails touting the same issuer, purporting to come from different, seemingly unrelated sources.  Many of these emails urged the recipients to buy shares of the issuers as soon as possible.

18.    Prior to these promotions, however, the Defendants or their associates generally obtained stock in the issuers that they were promoting.  At the same time that they were encouraging the email recipients to buy the promoted stocks, the Defendants or their associates sold their shares into the buying activity that they generated.

19.    While the promotional emails contained lengthy disclaimers, these disclaimers did not reveal the promoters' stock ownership or their intention to immediately sell their shares and profit from the increase in price and demand that their touts generated.

20.     The Defendants took elaborate measures to obscure their identities and to conceal their association with the promotional websites and trading activity.  They adopted multiple aliases, deployed multiple nominee entities (purportedly based throughout the world), used multiple email addresses, and employed multiple bank and brokerage accounts in the U.S. and abroad.

21.     The Defendants worked in concert to effectuate the scheme.  Among other things:

- **Aaron** wrote, created, and helped design the email and website promotions;

- **Shalon** contributed to the email content, sent out the promotional emails, and approved the use of funds by Orenstein to purchase domain names; and

- **Orenstein** handled back-office duties, such as setting up websites, maintaining brokerage accounts using aliases, directing payments to third parties; and often communicating with the financial firms about these accounts on behalf of the Defendants.

22.     In each case, the Defendants' promotional campaign was accompanied by a spate of contemporaneous press releases put out by the issuer, many of which were suspicious in both their timing and content.

23.     In each case, after the Defendants' promotional campaign ceased (and the Defendants and their associates had sold their shares), the stock price and trading volume plummeted, leaving investors with losses and with holdings of relatively illiquid stock.

**The SHOM Scheme**

24.     In May 2011, the Defendants engaged in a promotion of SHOM, a penny stock issuer that purported to be a provider of "healthcare services, staffing and durable medical equipment to medical institutions."  Aaron and Shalon sent out a series of promotional emails from May 19 through May 25, 2011, from websites and domains they controlled, including pennystockdiscoveries.com and obscurestocks.com.

25.     The emails encouraged readers to buy SHOM shares.  The emails touted SHOM as a great investment for long-term growth.  Among other things, the emails claimed that investing in SHOM presented "an unprecedented opportunity for you to potentially profit with a company set to capture a sizeable portion of the health care market"  and that "trading for just pennies on the dollar, the time is right to buy shares in SHOM."

26.     The disclaimers used by Aaron and Shalon on the promotional materials stated that the promotional websites were subsidiaries of a fictional entity, which had received SHOM shares as payment for the promotions. The disclaimers stated that:

> officers, directors, and employees of the featured company
> or [the fictional entity] and anyone mentioned in this report,
> and members of their families may hold a position and may
> SELL their entire positions or trade in these securities for
> their own accounts including when this report is distributed.
> (Underlining added.)

27.     In fact, the promoters, *i.e.* the Defendants, *intended* to sell their positions as soon as the emails were distributed.

28.     During and immediately following the promotional campaign, the price and trading volume of SHOM shares increased dramatically.  On May 20, 2011, the closing share price reached $0.33, an increase of over 1,800% over to the average closing

price of $0.017 during the trading days immediately preceding the promotion, and, on

May 23, 2011, the trading volume exceeded 30 million shares, compared to the average

daily trading volume of approximately 1.2 million shares for the three months

immediately preceding the promotion.

29.    The Defendants took advantage of this temporary increase in price and

liquidity by selling 15 million shares of SHOM for proceeds of more than $300,000.

These shares were sold through an account in the name of Entersa Ltd. (an entity

controlled by the Defendants) at Broker A ("Entersa Account A").  Entersa Account A

was opened by "Mike Shields," an alias used by Aaron.  Entersa Account A account

statements were sent to "Christopher Engeham," an alias used by Shalon.

**The GRAS Scheme**

30.    In the summer of 2011, the Defendants participated in a promotion of

GRAS, a penny stock issuer that purported to be a "consumer and wholesale driven

producer of grassfed beef focused on delivering its product to major retail grocery chains

throughout the country."

31.    Beginning around July 12, 2011, defendants Aaron and Shalon, through

their websites and domains, including stockcastle.com,

wallstreetpennystockadvisors.com, and obscurestocks.com, issued promotional emails

touting GRAS, claiming among other things that GRAS "shares are up over 8-fold in the

last few months and could easily quadruple again in value in the next six months." The

emails encouraged readers to buy GRAS shares.  For example, an email from

stockcastle.com on July 18, 2011 says:

> Now is probably the lowest you will see **GRAS** so you
> should scoop some stock up before another announcement
> sends the price soaring! (Emphasis in original.)

32.     Disclaimers used by Aaron and Shalon in the GRAS promotions claimed

that the websites touting GRAS were subsidiaries of another entity (secretly controlled by

the Defendants"), that the entity had been compensated in GRAS shares for the

promotion, and that:

> officers, directors, and employees of the featured company or [a
> fictional entity controlled by the defendants] and anyone
> mentioned in this report, and members of their families may hold a
> position and may SELL their entire positions or trade in these
> securities for their own accounts including when this report is
> distributed. (Underlining added.)

33.     In fact, the promoters, *i.e.* the Defendants, *intended* to sell their positions

as soon as the emails were distributed.

34.     During and immediately following the promotional campaign, the price

and trading volume of GRAS shares increased dramatically. On July 14, 2011, the

closing share price reached $0.58, an increase of about 286% over to the average closing

price of $0.15 during the trading days immediately preceding the promotions. For the

three-month period prior to the promotion, GRAS was very thinly traded with an average

daily trading volume of approximately 9,700 shares; however, during the promotion

period, the average daily trading volume skyrocketed to over 1.2 million shares.

35.     The Defendants took advantage of this temporary increase in price and

liquidity by selling at least 286,000 shares for proceeds of at least $123,000. The

Defendants sold these shares through an account in the name of Entersa at Broker B

("Entersa Account B"). John Avery, an alias of Orenstein, was an authorized signatory

on Entersa Account B.

**The NGMC Scheme**

36.     In August 2011, the Defendants conducted a promotion of NGMC, a penny stock issuer that purported to be an "independent oil and natural gas company, engaged in the exploration, development, and production of natural gas properties located onshore in the United States."  The promotion was disseminated via emails through websites and domains that the Defendants controlled, including obscurestocks.com, stockcastle.com, and wallstreetpennystockadvisors.com.

37.     These emails touted NGMC's business model and the growing demand for oil in developing markets, and encouraged investors to buy shares in NGMC, touting its "enormous profit potential."  An August 12, 2011 email stated "We think now is a good time to invest in NGMC."

38.     Similar to the SHOM and GRAS promotional materials, the disclaimers on the NGMC promotional materials claimed that their websites and domains were wholly-owned subsidiaries of a fictional entity, and that the entity had received shares of NGMC as compensation for sending the newsletter.

39.     These disclaimers, as with those used in the SHOM  and GRAS promotions, claimed that the fictional entity "and anyone mentioned in this report, and members of their families may hold a position and may SELL their entire positions or trade in these securities for their own accounts including when this report is distributed." (Underlining added.)

40.     In fact, the promoters, *i.e.* the Defendants, *intended* to sell their positions as soon as the emails were distributed.

41.     During and immediately following the promotional campaign, the price

and trading volume of NGMC shares increased dramatically.  On August 15, 2011, the

closing share price reached $0.43, an increase of about 93% over to the average closing

price of $0.222 during the trading days immediately preceding the promotions.  During

the three months preceding the promotion, the average daily trading volume was

approximately 23,000 shares; however, during the promotion period, the average daily

trading volume increased more than ten-fold to more than 240,000 shares.

42.     The Defendants took advantage of this temporary increase in price and

liquidity by selling at least 93,000 shares of NGMC for proceeds of more than $36,000.

Prior to these sales, Aaron emailed Orenstein in connection with the acquisition of

NGMC shares and asked Orenstein to look into the status of these shares.

**The MSTG Scheme**

43.     In early 2012, the Defendants conducted a promotion of the stock of

MSTG, a penny stock issuer that purported to be a mining company focused on the

exploration, development, and operation of gold mines in Honduras.

44.     Aaron and Shalon disseminated multiple promotional emails through

websites and domains that they controlled, including stockcastle.com and

WallStreetPennyStockAdvisors.  The promotions claimed, among other things, that

MSTG had purchased mining equipment expected to support 1,000 ounces of gold a

month, and that "Mustang is sitting on at least $1.7 billion worth of gold, plus potentially

hundreds and millions worth of silver."

45.     The promotions contained a disclaimer that the website, through its parent

company (a fictional entity) had received cash from another entity (secretly controlled by

the Defendants) in compensation for the promotions.  This disclaimer misleadingly failed

to disclose that while promoting MSTG, the Defendants actually were selling MSTG stock from accounts that they controlled and were benefitting from the rise in stock price resulting from their promotional activity.

46.     During and immediately following the promotional campaign, the price and trading volume of MSTG shares increased dramatically.  On February 26, 2012, the closing share price reached $1.45, an increase of about 65% over to the average closing price of $0.88 during the trading days immediately preceding the promotions.  During the three-month period preceding the promotion, the average daily trading volume was approximately 35,000 shares; however, during the promotional period, the average daily trading volume increased more than twenty-fold to more than 750,000 shares.

47.     The Defendants took advantage of this temporary increase in price and liquidity by depositing 2.5 million shares in an account at Broker B, and selling at least 1.9 million shares during the promotion for proceeds of over $2.2 million.

**The IDOI Scheme**

48.     In July and August, 2012, the Defendants participated in a promotion of IDOI, a penny stock issuer that purported to be engaged "in the design, development and marketing of shoe scanning device[s] for the homeland security and loss prevention markets."

49.     Aaron and Shalon disseminated promotional emails through many of their websites and domains, including ultimatepennystocks.com and UpcomingPennyStocks.com.  Their promotions claimed, among other things, that "IDOI could turn every $5000 invested today into $55,000 very quickly and potentially more than $250,000 in two years."  The emails encouraged readers to purchase shares of IDOI,

including statements like "Call your broker today.  Whatever you do, don't miss out" and

"IDOI could potentially jump to $5.00 as IDOI keeps expanding worldwide and perhaps

next year into an airport near you."

50.     As in their MSTG promotional materials, the promotions contained a

disclaimer that the website, through its parent company (a fictional entity) had received

cash from another entity (secretly controlled by the Defendants) in compensation for the

promotions.

51.     This disclaimer misleadingly failed to disclose that while promoting IDOI,

an associate of the Defendants actually was selling hundreds of thousands of shares of

IDOI stock with proceeds in the hundreds of thousands of dollars, and was sharing the

profits from the scheme with the Defendants.

52.     During and immediately following the promotional campaign, the price

and trading volume of IDOI shares increased dramatically.  On July 23, 2012, the closing

share price reached $0.72, an increase of about 112% over to the average closing price of

$0.339 during the trading days immediately preceding the promotions.  During the three-

month period preceding the promotion, the average daily trading volume was

approximately 102,000 shares; however, during the promotional period, the average daily

trading volume increased more than ten-fold to more than 1.2 million shares.

53.      A fund controlled by an associate of the Defendants benefitted from the

temporary increase in price in liquidity and sold at least 900,000 share of IDOI netting at

least $580,000, a portion of which was shared with the Defendants.

**The BRND Scheme**

54.     In October 2012, Defendants participated in a scheme to manipulate the price of BRND, a purported consumer goods incubator in the business of creating, acquiring and marketing consumer packaged goods, primarily beverages and nutritional supplements, and selling them into supermarkets, pharmacies and convenience stores.

55.     In mid-October 2012, the Aaron and Shalon issued promotional emails from several of their websites and domains, including hottestpennystocks.com, stockcastle.com, obscurestocks.com, and wallstreetpennystockadvisors.com, proclaiming, among other things, that "Premier Brands works the red-hot $100 billion energy drink market – and Wall Street."  Another email claimed that "people who act early on BRND will get ten times, if not 100 times returned in long term profits."

56.     As in their MSTG and IDOI promotional materials, the Defendants' promotions contained a disclaimer that the website, through its parent company (a fictional entity) had received cash from another entity, in this case Realto Investments Ltd, in compensation for the promotions.  Prior to the promotion, Aaron emailed Orenstein about the name of an entity to use in connection with the promotion, and Orenstein replied "Realto Investments."

57.     The disclaimer misleadingly failed to disclose that, while promoting BRND, the Defendants actually were selling BRND stock from an account that they controlled and were benefitting from the rise in stock price resulting from their promotional activity.

58.     During and immediately following the promotional campaign, the price and trading volume of BRND shares increased dramatically.  On October 19, 2012, the

closing share price reached $0.825, an increase of about 41% over to the average closing price of $0.586 during the trading days immediately preceding the promotions. During the three-month period preceding the promotion, the average daily trading volume was roughly 87,000 shares; however, during the promotional period, the average daily trading volume increased more than five-fold to more than 480,000 shares.

59.     The Defendants took advantage of this temporary increase in price and liquidity by selling at least 275,000 shares of BRND through an account they secretly controlled, for profits of at least $216,000.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a)(2) of the Securities Act
### (Aaron and Shalon)

60.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 59.

61.     Defendants Aaron and Shalon, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly obtained money or property by means of an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

62.     By reason of the conduct described above, Defendants Aaron and Shalon, and Orenstein, directly or indirectly, violated, and, unless enjoined, will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

15

## SECOND CLAIM FOR RELIEF

**Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act
(All Defendants)**

63.     The Commission realleges and incorporates by reference herein each and
every allegation contained in paragraphs 1 through 59.

64.     Defendants Aaron, Shalon and Orenstein, in the offer or sale of securities,
by the use of means or instruments of transportation or communication in interstate
commerce or by the use of the mails, directly or indirectly: employed devices, schemes or
artifices to defraud; and  engaged in transactions, practices or courses of business which
operate or would operate as a fraud or deceit upon a purchaser.

65.     By reason of the conduct described above, Defendants Aaron, Shalon, and
Orenstein, directly or indirectly, violated, and, unless enjoined, will again violate, Section
17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM FOR RELIEF

**Violations of Section 10(b) of the
Exchange Act and Rule 10b-5(b)
(Aaron and Shalon)**

66.     The Commission realleges and incorporates by reference herein each and
every allegation contained in paragraphs 1 through 59.

67.     Defendants Aaron and Shalon, directly or indirectly, singly or in concert,
knowingly or recklessly, by the use of the means or instrumentalities of interstate
commerce or of the mails, or of the facilities of a national securities exchange, in
connection with the purchase or sale of securities, knowingly or recklessly, made untrue
statements of material fact and have omitted to state material facts necessary in order to

make the statements made, in the light of the circumstances under which they were made,

not misleading.

68.     By reason of the foregoing, Defendants Aaron, Shalon and Orenstein,

singly or in concert, directly or indirectly, violated and, unless enjoined, will again violate,

Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17

C.F.R. § 240.10b-5].

### FOURTH CLAIM FOR RELIEF

**Violations of Section 10(b) of the**
**Exchange Act and Rules 10b-5(a) and 10b-5(c)**
**(All Defendants)**

69.     The Commission realleges and incorporates by reference herein each and

every allegation contained in paragraphs 1 through 59.

70.     Defendants Aaron, Shalon and Orenstein, directly or indirectly, singly or

in concert, knowingly or recklessly, by the use of the means or instrumentalities of

interstate commerce or of the mails, or of the facilities of a national securities exchange,

in connection with the purchase or sale of securities, knowingly or recklessly, have

employed devices, schemes and artifices to defraud, and engaged in acts, practices and

courses of business which operated or would have operated as a fraud or deceit upon

purchases of securities or upon other persons.

71.     By reason of the foregoing, Defendants Aaron, Shalon and Orenstein,

singly or in concert, directly or indirectly, violated and, unless enjoined, will again violate,

Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17

C.F.R. § 240.10b-5].

## FIFTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of
### Exchange Act Section 10(b) and Rule 10b-5 and Securities Act Section 17(a)
### (All Defendants)

72.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 59.

73.     Aaron, Shalon and Orenstein knowingly or recklessly provided substantial assistance to each other in the commission of the forgoing violations.

74.     By reason of the foregoing, Defendants, singly or in concert, directly or indirectly, violated and, unless enjoined, will again violate,  Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)], Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

A.     Permanently enjoining Defendants from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and  Section 10(b) the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5  [17 C.F.R. § 240.10b-5] thereunder

B.     Ordering Defendants to disgorge all ill-gotten gains that they obtained as a result of the conduct, acts or courses of conduct described in this Complaint, and to pay prejudgment interest thereon;

C.     Ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act 15 U.S.C. § 77t(d)]  Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

D.     Prohibiting Defendants, pursuant to Section 21(d)(6)(A) of the Exchange Act [15 U.S.C. § 78u(d)(6)(A)] from participating in an offering of penny stock; and

      E.      Granting such other and further relief as the Court may deem just and

proper.


Dated:    New York, New York
           July 21, 2015


                                Respectfully submitted,

                                *Sanjay Wadhwa*

                                Sanjay Wadhwa
                                Senior Associate Regional Director

                                Andrew M. Calamari
                                Michael D. Paley
                                Paul G. Gizzi
                                Judith Weinstock
                                Kristine M. Zaleskas
                                Attorneys for Plaintiff
                                SECURITIES AND EXCHANGE
                                    COMMISSION
                                New York Regional Office
                                200 Vesey Street, Suite 400
                                New York, New York 10281-1022
                                (212) 336-9078 (Weinstock)
                                Email:  WeinstockJ@SEC.gov